**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

CHRIS DAVENPORT,                      )
                                      )
           Plaintiff,      )      Case No. CV 05-054-E-LMB
                                      )
v.                                    )      **MEMORANDUM DECISION**
                                      )      **AND ORDER**
STATE OF IDAHO DEPARTMENT OF          )
ENVIRONMENTAL QUALITY,                )
                                      )
           Defendant.      )
_____)

       Currently pending before the Court are Defendant's Motion for Summary Judgment

(Docket No. 13), Defendant's Motion for Entry of Order for Access to Medical Records and

Information and Entry of Qualified Protective Order (Docket No. 22), and Defendant's Motion

to Strike Affidavit (Docket No. 23).  Having carefully reviewed the record, considered oral

arguments, and otherwise being fully advised, the Court enters the following Memorandum

Decision and Order.

**I.**

**BACKGROUND**

       Chris Davenport ("Plaintiff") has lived with insulin-dependent diabetes for over twenty

years.  *Davenport Affidavit*, ¶ 2 (Docket No. 19, Att. 3).  In or around February 2003, Plaintiff

applied for and was hired for an A-3 position as a Remediation Scientist in the Idaho Falls Office

of the State of Idaho Department of Environmental Quality ("Defendant" or "DEQ").  *Id*. at ¶¶

12–18.  Prior to taking the A-3 position, Plaintiff had been employed for approximately six-and-

one-half years in the DEQ's Boise office, primarily as a Human Resources ("HR") Specialist. *Id.* at ¶ 10.

In taking the A-3 position, Plaintiff was subjected to a six-month probationary period and to medical monitoring. *See Defendant's Statement of Undisputed Facts*, ¶¶ 2–3 (Docket No. 15). Because of the medical monitoring, the DEQ required Plaintiff to have a baseline physical. *Davenport Affidavit*, ¶ 16 (Docket No. 19, Att. 3). During Plaintiff's physical, conducted by Dr. Tony Golden, M.D., Plaintiff informed Dr. Golden that he had diabetes. *Id*. at ¶ 17. Though Plaintiff did not report any problems with controlling his diabetes, following the physical, Dr. Golden recommended the following work restrictions:

> 1) No work at unprotected heights.
> 2) No confined space work.
> 3) No work with unguarded hazardous machinery.
> 4) Limited respirator use to light to moderate work loads and no prolonged use in heat stress environments.
> 5) No work alone.

*Mar. 23, 2003, Letter From Golden to Davenport, Exhibit B to Davenport Affidavit*, p. 15 (Docket No. 19, Att. 3).

Based on Dr. Golden's recommendations and despite Plaintiff's insistence that the restrictions were not necessary, the DEQ adopted the restrictions and prohibited Plaintiff from performing field work alone and also prohibited Plaintiff from driving department vehicles. *Davenport Affidavit*, ¶ 19 (Docket No. 19, Att. 3). Thus, according to Plaintiff, "[f]or approximately 11 to 12 weeks, [he] was primarily stuck in the office with very little to do." *Id*. at ¶ 22. Plaintiff further reports that "[o]n very few occasions did another employee take [him] with them in the field." *Id*. Plaintiff states that "[o]n several occasions, employees asked [him] whether [he] could go with them in the field on a certain assignment," that he always has to

obtain approval before going, and that "[o]n nearly every occasion that [he] asked to be allowed to go into the field with another employee, the request was denied." *Id*. at ¶ 23.

In an attempt to have the work restrictions removed, Plaintiff obtained the opinion of his treating physician's assistant, which the DEQ reportedly found to be insufficient to release Plaintiff from Dr. Golden's restrictions. *Id*. at ¶ 24. Hence, Plaintiff made an appointment with Dr. John E. Liljenquist, a physician who specializes in the treatment of diabetes. *Id*. at ¶ 25.

In a May 9, 2003, letter to Dr. Golden, which was also sent to the DEQ, Dr. Liljenquist reported that, in his best medical opinion, the work restrictions were not necessary. *May 9, 2003, Letter From Liljenquist to Golden*, *Exhibit C to Davenport Affidavit*, p. 17 (Docket No. 19, Att. 3). Despite Dr. Liljenquist's letter, the DEQ did not remove the work restrictions. *Davenport Affidavit*, ¶ 26 (Docket No. 19, Att. 3). To the contrary, the DEQ claimed that Dr. Golden's approval was necessary prior to removal of the restrictions. *Id*. Thus, on May 27, 2003, in response to a letter from Dr. Golden explaining the purpose of the restrictions and at Plaintiff's request, Dr. Liljenquist wrote another letter, opining that the work restrictions were not necessary. *May 27, 2003, Letter From Liljenquist to Johnston*, *Exhibit E to Davenport Affidavit*, pp. 25–27 (Docket No. 19, Att. 3).

In mid June 2003, the work restrictions were lifted. *Davenport Affidavit*, ¶ 30 (Docket No. 19, Att. 3). Shortly thereafter, on June 20, 2003, Plaintiff was informed by Steve Heaton, Remediation Manager for the Idaho Falls office, that he had failed his probationary period for the A-3 position. *Id*. at ¶ 31. According to Defendant, there were several problems with Plaintiff's work, including difficulty in understanding the content of typical reports, basic notations in laboratory data sheets, latitude and longitude readings, and compass bearings, placing a monitor well in the wrong location due to inability to recognize a clay layer or

**MEMORANDUM DECISION & ORDER -3-**

understand its significance, and failing to properly prepare ground water samples for analysis. *Heaton Deposition*, *Exhibit 2 to Tingey Affidavit*, pp. 4, 6–8, 11–12 (Docket No. 14, Att. 2); *June 20, 2003, Notes*, *Exhibit 28 to Heaton Deposition*, *Exhibit 6 to Tingey Affidavit*, p. 2 (Docket No. 14, Att. 6); *see also Johnston Deposition*, *Exhibit 3 to Tingey Affidavit*, pp. 2, 4 (Docket No. 14, Att. 3) (noting Heaton's reported concerns about Plaintiff's abilities to adequately perform the job); *Johnston Deposition*, *Exhibit 3 to Tingey Affidavit*, p. 5 (noting Johnston's disbelief that Plaintiff had the "basic technical abilities to do the basic requirements of the job") (Docket No. 14, Att. 3).

Upon failing the probationary period at the A-3 position, rather than being returned to his HR position in Boise, Plaintiff was transferred to an A-2 position as a Water Quality Analyst, which allowed him to remain in Idaho Falls. *Davenport Affidavit*, ¶ 35 (Docket No. 19, Att. 3). According to Plaintiff, he was told by Jim Johnston, DEQ Regional Administrator for Eastern Idaho, who was apparently very reluctant to offer Plaintiff the A-2 position, that Plaintiff would be "under a microscope and that [Plaintiff] would have to learn the job all on [his] own." *Id.* Further, Plaintiff was subjected to a new six-month probationary period in the A-2 position. *See Defendant's Statement of Undisputed Facts*, ¶ 5 (Docket No. 15).

Shortly after beginning the A-2 position, Plaintiff was given several books of material to review and was informed that he would be given an examination. *Davenport Affidavit*, ¶ 41 (Docket No. 19, Att. 3). According to Plaintiff, on a Monday morning, without advance notice, Plaintiff's supervisor, William Teuscher, informed Plaintiff that he would be given the exam that day. *Id.* at ¶ 43. Plaintiff asserts that he "had no opportunity to review the material before the test was given." *Id.* Interestingly, no other A-2 in the State of Idaho has ever been required to take such an exam. *Johnston Deposition*, *Exhibit 3 to Casperson Affidavit*, p. 27 (Docket No. 19,

**MEMORANDUM DECISION & ORDER -4-**

Att. 2); *Osborn Deposition*, *Exhibit 1 to Casperson Affidavit*, pp. 7–8 (Docket No. 19, Att. 2);

*Teuscher Deposition*, *Exhibit 5 to Casperson Affidavit*, p. 36 (Docket No. 19, Att. 2). Later,

Plaintiff was told he had failed the exam. *Davenport Affidavit*, ¶ 44 (Docket No. 19, Att. 3).

Shortly thereafter, Teuscher and Heaton stopped meeting with Plaintiff, and he was told to look

for a new job. *Id.* at ¶ 45. All this occurred when Plaintiff had been in the A-2 for just two

months. *Id.*

       On October 9, 2003, Plaintiff was formerly notified that he had failed his probationary

period in the A-2 position. *Oct. 9, 2003, Letter From Allred to Davenport*, *Exhibit I to*

*Davenport Affidavit*, p. 43 (Docket No. 19, Att. 3). Thus, and because his former HR Specialist

position in Boise was no longer available, on October 24, 2003, the DEQ terminated Plaintiff's

employment. *Davenport Affidavit*, ¶ 47 (Docket No. 19, Att. 3).

       On February 22, 2005, Plaintiff filed a Complaint and Demand for Jury Trial (Docket No.

1) against Defendant, bringing the following counts: violation of the Rehabilitation Act for

disability discrimination (Count 1); violation of the Idaho Human Rights Act for disability

discrimination (Count 2); violation of the Americans with Disabilities Act for disability

discrimination (Count 3); violation of the Rehabilitation Act for failure to accommodate (Count

4); and violation of the Idaho Human Rights Act for failure to accommodate (Count 5).[1]

Defendant now seeks summary judgment on all counts. *Defendant's Motion for Summary*

*Judgment* (Docket No. 13).

---

[1] Plaintiff amended his Complaint on March 8, 2005, but asserted the same counts against Defendant. *Amended Complaint & Demand for Jury Trial* (Docket No. 3).

**MEMORANDUM DECISION & ORDER -5-**

## II.

## MOTION FOR SUMMARY JUDGMENT

On June 13, 2006, Defendant filed its Motion for Summary Judgment, seeking judgment in its favor on all counts and arguing that (1) Plaintiff's claims based on the Americans with Disabilities Act ("ADA") are barred by the Eleventh Amendment, (2) Plaintiff's claims of disability discrimination fail because Plaintiff does not have a qualified disability, and, even if Plaintiff had such a disability, Defendant had a legitimate, nondiscriminatory reason for the alleged adverse employment actions, which reason Plaintiff cannot show was a pretext for discrimination, and (3) the facts do not support a claim for failure to accommodate. *Defendant's Memorandum in Support of Motion for Summary Judgment* (Docket No. 13, Att. 1). Plaintiff opposes the motion. *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment* (Docket No. 19).

### A.      Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

#### 1.      Genuine Issue of Material Fact

According to Rule 56, an issue must be both "material" and "genuine" to preclude entry

of summary judgment.  An issue is "material" if it affects the outcome of the litigation.  *Hahn v.*

*Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).  A material fact is

> one that is relevant to an element of a claim or defense and whose
> existence might affect the outcome of the suit.  The materiality of a fact is
> thus determined by the substantive law governing the claim or defense.
> Disputes over irrelevant or unnecessary facts will not preclude a grant of
> summary judgment.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

An issue is "genuine" when there is "sufficient evidence supporting the claimed factual

dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at

trial."  *Hahn*, 523 F.2d at 464 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253,

289 (1968)).  Accordingly, "[a] mere scintilla of evidence supporting the non-moving party's

position is insufficient; there must be evidence on which a jury could reasonably find for the

nonmoving party."  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Likewise, "mere allegation and

speculation do not create a factual dispute for purposes of summary judgment."  *Nelson v. Pima*

*Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266

(9th Cir. 1995)).  Further, because factual disputes are to be resolved at trial, in ruling on

summary judgment motions, the Court does not resolve conflicting evidence with respect to

disputed material facts, nor does it make credibility determinations.  *T.W. Elec. Serv., Inc.*, 809

F.2d at 630.  Moreover, all inferences must be drawn in the light most favorable to the

nonmoving party.  *Id*. at 631.

**MEMORANDUM DECISION & ORDER -7-**

## 2.   <u>Moving and Nonmoving Parties' Burdens</u>

The initial burden is on the moving party to show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983); Fed. R. Civ. P. 56(c).  If the moving party meets its initial burden, the nonmoving party must "produce 'specific facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."  *Steckl*, 703 F.2d at 393 (quoting *Ruffin v. County of L.A.*, 607 F.2d 1276, 1280 (9th Cir. 1979)).  In addition, the nonmoving party must make a showing sufficient to establish the existence of an element that is essential to the party's case and upon which the party will bear the burden of proof at trial; otherwise, summary judgment is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the nonmoving party fails to make such a showing on any essential element of the nonmoving party's case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id*. at 323; *see also* Fed. R. Civ. P. 56(e).[2]  In order to withstand a motion for summary judgment, a nonmoving party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence

---

[2] Rule 56(e) states that, in responding to a motion for summary judgment,
> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

MEMORANDUM DECISION & ORDER -8-

> than would otherwise be necessary when the factual context makes the
> non-moving party's claim implausible.

*British Motor Car Distribs., Ltd. v. S.F. Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir.

1989) (citation omitted).

In recent years, the Supreme Court, "by clarifying what the non-moving party must do to

withstand a motion for summary judgment, has increased the utility of summary judgment."

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.

1987).  Therefore, "[n]o longer can it be argued that any disagreement about a material issue of

fact precludes the use of summary judgment."  *Id.*  Nonetheless, "if a rational trier of fact might

resolve the issue in favor of the nonmoving party, summary judgment must be denied."  *T.W.*

*Elec. Serv., Inc.*, 809 F.2d at 631; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

(holding a motion for summary judgment must be denied when the "evidence is such that a

reasonable jury could return a verdict for the nonmoving party").

**B.**    **The ADA and the Eleventh Amendment**

Count Three of Plaintiff's Complaint asserts a violation of the Americans With

Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").  *Amended Complaint & Demand for Jury*

*Trial*, p. 11 (Docket No. 3).  The ADA contains five titles: Employment (Title I), Public Services

(Title II), Public Accommodations and Services Operated by Private Entities (Title III),

Telecommunications (Title IV), and Miscellaneous Provisions (Title V).  *Zimmerman v. Or.*

*Dep't of Justice*, 170 F.3d 1169, 1172 (9th Cir. 1999).  Plaintiff, in bringing a claim under the

ADA, has not specified which title applies.  However, Plaintiff's arguments indicate that the

only potentially applicable titles are Title I (Employment) and Title II (Public Services).  *See*

*Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, pp. 3–4 (Docket No.

**MEMORANDUM DECISION & ORDER -9-**

19).  Defendant argues that, whether under Title I or Title II of the ADA, Plaintiff is barred by

the Eleventh Amendment from asserting this count.  *Defendant's Memorandum in Support of*

*Motion for Summary Judgment*, pp. 1–2 (Docket No. 13, Att. 1).

       The Eleventh Amendment of the United States Constitution guarantees that

nonconsenting States may not be sued by private individuals in federal court.  *Bd. of Trs. of the*

*Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  Pursuant to the Eleventh Amendment, suits

by private individuals against a state for money damages under Title I of the ADA are barred by

the state's sovereign immunity.  *Id*. at 374.  Further, as clarified by the Ninth Circuit Court of

Appeals, Title II of the ADA does not apply to employment actions.  *Zimmerman*, 170 F.3d at

1178.  Thus, Plaintiff cannot bring a claim against Defendant under Title I for money damages,

or under Title II.  Accordingly, Defendant's Motion for Summary Judgment on Count Three is

granted to the extent Plaintiff seeks recovery under Title II of the ADA or seeks recovery of

money damages under Title I of the ADA.  However, Plaintiff is not barred by the Eleventh

Amendment from continuing to assert this count under Title I of the ADA in seeking non-

monetary damages.

## C.   <u>Disability Discrimination</u>

       In Counts One, Two, and Three, Plaintiff asserts claims of disability discrimination in

violation of the Rehabilitation Act, the Idaho Human Rights Act ("HRA"), and the ADA,

respectively.  *Amended Complaint & Demand for Jury Trial*, pp. 9–11 (Docket No. 3).  To bring

a disability discrimination claim under any of these acts, a plaintiff must have a qualified

disability.  *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12112(a); Idaho Code §§ 67-5909, 67-5902(15).

Defendant argues that Plaintiff lacks the necessary qualified disability and, thus, may not bring

these claims of disability discrimination.  *Defendant's Memorandum in Support of Motion for Summary Judgment*, p. 6 (Docket No. 13, Att. 1).

In determining whether Plaintiff falls within the provisions of the three acts, essentially the same legal standard and analysis applies to all three.  *See* 29 U.S.C. § 791(g) (noting that the standard used to determine whether there has been a violation of this section are the standards applied under Title I of the ADA); Idaho Code § 67-5901(1) (noting that the purpose of the Idaho HRA is to provide for execution within the state of the policies embodied in Titles I and III of the ADA).[3]

The ADA and, in following with the ADA, the Rehabilitation Act and the Idaho HRA were enacted in an effort to eliminate discrimination against individuals with disabilities, particularly such discrimination with regard to employment decisions.  *Broussard v. Univ. of Cal., at Berkeley*, 192 F.3d 1252, 1255 (9th Cir. 1999).  Thus, the acts prohibit an employer from discriminating against a qualified individual with a disability because of the disability in regard to job application procedures; the hiring, advancement, or discharge of employees; employee compensation; job training; and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a); *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

To make out a claim under any of these acts, Plaintiff must show (1) that he is an individual with a disability within the meaning of the ADA, (2) that he was qualified, with or without a reasonable accommodation, to perform the essential functions of the job, and (3) that he was subjected to discrimination because of his disability.  *Broussard*, 192 F.3d at 1255–56.

---

[3] The Court agrees with Plaintiff and Defendant "that cases for disability discrimination under the Rehabilitation Act, the ADA, and the Idaho Human Rights Act are analyzed the same" and that, consequently, Plaintiff's "claims for disability discrimination under each statutory scheme can be addressed together."  *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, p. 5 (Docket No. 19).

**MEMORANDUM DECISION & ORDER -11-**

In evaluating whether Plaintiff has made such a showing, because Defendant has disclaimed reliance on Plaintiff's alleged disability in making the allegedly-wrongful employment decisions, the Court must apply a burden-shifting standard. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1175–76 (9th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which establishes the burden-shifting standard). Accordingly, Plaintiff bears the initial burden of establishing the *prima facie* case of disability discrimination by presenting evidence that gives rise to an inference of unlawful disability discrimination. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Notably, "[t]he amount [of evidence] that must be produced in order to create a *prima facie* case is 'very little.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). The establishment of the *prima facie* case effectively creates a presumption that the employer unlawfully discriminated against the employee. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Further, the establishment of the *prima facie* case shifts the burden to Defendant to produce evidence that it had a legitimate, nondiscriminatory reason for the allegedly-wrongful employment decision. *Bradley*, 104 F.3d at 270; *Wallis*, 26 F.3d at 889. If Defendant meets its burden, the presumption of unlawful discrimination "simply drops out of the picture," *Wallis*, 26 F.3d at 889 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)), and Plaintiff bears the ultimate burden of persuading the Court that the stated reasons for the adverse employment actions were false and the true reasons was disability discrimination, *Bradley*, 104 F.3d at 270. In making such a showing, Plaintiff must do more than establish a *prima facie* case and deny the credibility of Defendant's evidence. *Id.* He must produce specific, substantial evidence of pretext. *Id.* (quoting *Wallis*, 26 F.3d at 890). When the evidence of pretext produced consists of more than the *prima facie* presumption, "a factual question will almost

always exist with respect to any claim of nondiscriminatory reason." *Wallis*, 26 F.3d at 890.

Accordingly, "[i]f a rational trier of fact could, on all the evidence, find that the employer's

action was taken for impermissibly discriminatory reasons, summary judgment for the defense is

inappropriate." *Id*. at 889.

### 1. *Prima Facie* **Case**

To establish a *prima facie* case, Plaintiff must first show (1) that he is an individual with

a disability within the meaning of the ADA, (2) that he was qualified, with or without a

reasonable accommodation, to perform the essential functions of the job, and (3) that he was

subjected to discrimination because of his disability. *Broussard*, 192 F.3d at 1255–56.

### a. **Disability**

To be considered under a disability within the meaning of the ADA, an individual must

either (A) have a physical or mental impairment that substantially limits one or more of the

major life activities of such individual, (B) have a record of such an impairment, or (C) be

regarded as having such an impairment. *Fraser v. Goodale*, 342 F.3d 1032, 1037–38 (9th Cir.

2003); 42 U.S.C. § 12102(2). A person need fit only one of the three categories to be disabled

for the purposes of the ADA. *Summers*, 127 F.3d at 1153. Whether a person has a qualifying

disability under the ADA is an individualized inquiry. *Sutton v. United Air Lines, Inc.*, 527 U.S.

471, 483 (1999).

Plaintiff contends he fits each of the categories. *Plaintiff's Memorandum in Opposition

to Motion for Summary Judgment*, p. 7 (Docket No. 19).

i.        **Substantially Limiting Physical Impairment**

The first category of the disability definition is met when a person has a physical or

mental impairment that substantially limits one or more of that person's major life activities.

*Fraser*, 342 F.3d at 1037–38; 42 U.S.C. § 12102(2).

A "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic

disfigurement, or anatomical loss affecting one or more of the following body systems:

neurological, musculoskeletal, special sense organs, respiratory (including speech organs),

cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and

endocrine." *Sutton*, 527 U.S. at 479–80.

A person is "substantially limited" by his or her physical impairment if he or she is

"[u]nable to perform a major life activity that the average person in the general population can

perform"; or is "significantly restricted as to the condition, manner or duration under which an

individual can perform a particular major life activity as compared to the condition, manner, or

duration under which the average person in the general population can perform that same major

life activity." *Id*. at 480 (quoting 29 C.F.R. § 1630.2(j)).  In this context, "substantially"

suggests "considerable" or "to a large degree," thus precluding impairments that interfere in only

a minor way with the performance of manual tasks from qualifying as disabilities.  *Toyota Motor*

*Mgf., Ky., Inc. v. Williams*, 534 U.S. 184, 196–97 (2002).

The determination of whether a person suffers from a substantially limiting impairment

must be made with reference to measures that mitigate the individual's impairment and the

positive and negative effects thereof.  *Sutton*, 527 U.S. at 475.  "A person whose physical or

mental impairment is corrected by medication or other measures does not have an impairment

that presently 'substantially limits' a major life activity."  *Id*. at 482.  In deciding whether a

person's impairment is substantially limiting, courts must consider "the nature and severity of the final impairment, the duration or expected duration of the impairment, as well as the permanent or long term impact of the impairment." *Fraser*, 342 F.3d at 1038 (citations omitted).

Finally, in this context, a "major life activity" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Sutton*, 527 U.S. at 480 (quoting 29 C.F.R. §1630.2(i)).

In this case, Plaintiff contends he fits the first category of the disability definition because his "diabetes is a physical impairment that substantially limits the major life activity of eating." *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, p. 7 (Docket No. 19).[4]

The Ninth Circuit Court of Appeals has recognized that eating may constitute a major life activity. *Fraser*, 342 F.3d at 1040. Thus, a diabetic may be considered disabled under the ADA if he or she is significantly restricted as to the condition, manner, or duration under which he or she can eat as compared to the condition, manner, or duration under which the average person in the general population can eat. *See id.* This is not to say that all diabetics, because they are all, at least in some way, restricted as to the condition, manner, or duration under which they can eat compared to the general population, have a "disability" as contemplated by the ADA. To the contrary, the courts have been careful to avoid a *per se* finding of disability for diabetics; thus, a careful, fact specific, individualized inquiry is required. *See, e.g.*, *Sutton*, 527 U.S. at 483 (rejecting an argument, which, if accepted, would have meant that a diabetic whose illness did not impair his or her daily activities would nonetheless be considered disabled because he or she

---

[4] In contending that he is substantially limited in the major life activity of eating, Plaintiff has made it clear that he is not asserting that he is substantially limited in the major life activity of *working*. *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, p. 7 ("DEQ assumes in its brief that Mr. Davenport is affected in the major life activity of working. Mr. Davenport, however, has never asserted that his diabetes affects his ability to work.")

**MEMORANDUM DECISION & ORDER -15-**

had diabetes); *Fraser*, 342 F.3d 1032 (determining whether plaintiff's diabetes was substantially

limiting before concluding that plaintiff was disabled as contemplated by the ADA); *Branham v.*

*Snow*, 392 F.3d 896 (7th Cir. 2004).

      In *Fraser*, the Ninth Circuit Court of Appeals held that a woman who was a "brittle"

diabetic had "presented evidence that the major life activity of eating [was] substantially limited

because of her demanding and highly difficult treatment regimen." 342 F.3d at 1042. The

evidence Fraser presented established that her "diabetes regimen is perpetual, severely

restrictive, and highly demanding." *Id*. at 1041. Specifically, the Ninth Circuit noted that

> Fraser must test her sugar several times daily, each test is painful, and
> takes close to five minutes to complete. She must vigilantly monitor what
> and how much she eats. She must time her daily shots and meals so
> carefully that it is not safe for her to live alone. (She could end up in the
> ambulance if she took too long a nap between a shot and breakfast.) She
> must always have certain foods available in case her blood sugar drops or
> skyrockets. She must always be able to take time to eat or give herself
> injections to balance her blood sugar levels. She cannot put a morsel of
> food in her mouth without carefully assessing whether it will tip her blood
> sugars out of balance. She cannot skip or postpone a snack or meal
> without cautiously studying her insulin and glucagon levels. She must
> constantly, faithfully, and precisely monitor her eating, exercise, blood
> sugar, and other health factors, and even this is no guarantee of success.
> . . .
>       Unlike a person with ordinary dietary restrictions, Fraser must
> monitor much more than what and how much she eats. Unlike a person
> with ordinary dietary restrictions, she does not enjoy a forgiving margin of
> error. While the typical person on a heart-healthy diet will not find
> himself in the emergency room if he eats too much at a meal or forgets his
> medication for a few hours, Fraser does not enjoy this luxury.
>      . . . Even when followed with utmost skill and faithfulness,
> Fraser's treatment regimen does not completely save her from the havoc
> her diabetes wreaks on her ability to eat normally . . . .

*Id*.

      In *Branham v. Snow*, the Seventh Circuit Court of Appeals likewise engaged in a fact-

intensive, individualized inquiry to determine whether an employee of the Internal Revenue

**MEMORANDUM DECISION & ORDER -16-**

Service, who had Type I, insulin-dependent diabetes, was disabled within the meaning of the

Rehabilitation Act due to his diabetes.  392 F.3d at 899, 902.  The Seventh Circuit remarked that

> Mr. Branham must check his blood sugar level four to five times a day.
> He controls his blood sugar through the use of insulin and through diet
> and exercise.  The readings produced by Mr. Branham's blood sugar tests
> dictate the amount of insulin that he must administer, as well as when and
> what type and amount of food he can eat.  It is possible for Mr. Branham
> to skip or delay meals on occasion.
>       Although Mr. Branham never has experienced a severe
> hyperglycemic or hypoglycemic reaction, approximately once every three
> weeks he does suffer from minor reactions to low blood sugar, including
> trembling and sweating.  At all times, Mr. Branham keeps with him
> additional insulin and a certain amount of carbohydrates, for use in the
> event his blood sugar level falls below an acceptable level.

*Id*. at 899.  Thus the Seventh Circuit observed that

> Mr. Branham's treatment regimen allows him to avoid severe
> hypoglycemic and hyperglycemic episodes, and protects him from the
> long term consequences of Type I diabetes . . . .
>       For Mr. Branham, [his] negative side effects are many.  He is
> significantly restricted as to the manner in which he can eat as compared
> to the average person in the general population.  His dietary intake is
> dictated by his diabetes, and must respond, with significant precision, to
> the blood sugar readings he takes four times a day.  Depending upon the
> level of his blood sugar, Mr. Branham may have to eat immediately, may
> have to wait to eat, or may have to eat certain types of food.  Even after
> the mitigating measures of his treatment regimen, he is never free to eat
> whatever he pleases because he risks both mild and severe bodily
> reactions if he disregards his blood sugar readings.  He must adjust his diet
> to compensate for any greater exertion, stress, or illness that he
> experiences.

*Id*. at 903–04.  Based on this record, the Seventh Circuit concluded that "a trier of fact rationally

could determine that Mr. Branham's diabetes and the treatment regimen that he must follow

substantially limit him in the major life activity of eating."  *Id*. at 904.  Accordingly, summary

judgment was inappropriate on the question of whether Mr. Branham was substantially limited in

a major life activity.  *Id*.

**MEMORANDUM DECISION & ORDER -17-**

After *Branham*, the Seventh Circuit again engaged in a fact-intensive, individualized inquiry to determine whether a postal employee suffering from Type 2 diabetes was disabled within the meaning of the meaning of the ADA. *Scheerer v. Potter*, 443 F.3d 916 (7th Cir. 2006). In concluding that Scheerer has not established that he suffered a substantial limitation in the major activity of eating, among other activities, the court noted that

> [a]lthough there can be no doubt that Scheerer suffered from pain and significant inconvenience from his progressively worsening diabetic condition, he does not point to enough evidence in the record to show that he was prevented from performing, or was otherwise, severely restricted in, any major life activities. During the pertinent time period, Scheerer did not experience many of the more severe symptoms of diabetes, including severe hypoglycemia, seizures, or loss of consciousness. This suggests that his diabetes had not yet worsened to such a stage where it severely restricted his major life activities.
> . . .
> In a similar vein, Scheerer did not present evidence showing that his dietary restrictions were sufficiently severe to rise to the level of a substantial limitation. That is, the predominant purpose of his dietary restrictions was to lose weight—as millions of other non-disabled individuals seek to do—rather than to control rapid fluctuations of his blood sugar levels that could lead to immediate and dire consequences. Moreover, his diet followed that general contours of the diets of most individuals seeking to lose weight. Thus, there is nothing in the record tending to show that his dietary restrictions were of the type of severe dietary restrictions that if not followed would lead to "dire and immediate consequences," or alternatively, were so unusually restrictive that they could impose a substantial limitation on the major life activity of eating.

*Id.* at 920.

In this case, Plaintiff has had insulin-dependent diabetes for over twenty years. *Davenport Affidavit*, ¶ 2 (Docket No. 19, Att. 3). He must monitor his glucose levels closely several times a day and must monitor his food intake carefully, "including volume, time of eating, and what [he] eat[s]." *Id.* at ¶¶ 3–4. The way his body reacts to certain food and amounts of food is always different; therefore, he must constantly assess the immediate affects of eating

any food.  *Id.* at ¶ 4.  When employed with the DEQ, Plaintiff controlled his diabetes with insulin shots at various times throughout the day.  *Id.* at ¶ 5.  He had to have some food available at all time and could not skip meals.  *Id.*  Importantly, though Plaintiff has never lost consciousness as a result of his diabetes, he states that even with his constant monitoring of his diabetes, he has "experienced problems, including confusion, inability to concentrate and vision problems."  *Id.* at ¶¶ 8–9.

Thus, Plaintiff's diabetic condition is much less severe than the condition of the plaintiff in *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003).  Accordingly, *Fraser* provides little assistance as to the appropriate outcome of the factual, individualized inquiry in this case.  Plaintiff's condition is much more similar to the conditions of the plaintiffs in *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004), and *Scherer v. Potter*, 443 F.3d 916 (7th Cir. 2006).  Thus, the Court will consider these Seventh Circuit opinions in determining whether Plaintiff's diabetic condition is at such a severe level as to impose a substantial limitation on Plaintiff's ability to engage in the major life activity of eating.

### (a).   Applying *Scherer*

As with the plaintiff in *Scherer*, there can be little doubt that Plaintiff suffers from significant inconvenience from his diabetic condition.  Also like the plaintiff in *Scherer*, Plaintiff has not experienced many of the more severe symptoms of diabetes, including severe hypoglycemia, seizures, or loss of consciousness.  Thus, Defendant urges the Court to conclude, as did the Seventh Circuit in *Scherer*, that Plaintiff has not presented sufficient evidence to show that his limitations are of the type that if not properly addressed would lead to "dire and immediate consequences," or alternatively, are so unusually restrictive that they could impose a

substantial limitation on the major life activity of eating. *Defendant's Supplemental Brief on Motion for Summary Judgment*, pp. 2–3 (Docket No. 32); *see Scheerer*, 443 F.3d at 920.

In concluding that Scheerer's diabetes did not substantially limit his ability to engage in the major life activity of eating, the Seventh Circuit noted that "the predominant purpose of [the plaintiff's] dietary restrictions was to lose weight . . . rather than to control rapid fluctuations of his blood sugar levels that could lead to immediate and dire consequences." *Scheerer*, 443 F.3d at 920. Thus, Scheerer's alleged *physical impairment*, his diabetes, did not limit his ability to engage in the major life activity of eating, his *weight* did.

The Ninth Circuit has likewise emphasized that, in engaging in the fact-intensive, individualized inquiry of whether an impairment is substantially limiting, the issue is whether *the particular impairment* that a plaintiff claims is disabling substantially limits a major life activity. *See Fraser*, 342 F.3d at 1038 (holding that in analyzing whether a person's impairment is substantially limiting, courts must consider "the nature and severity of *the* final impairment, the duration or expected duration of *the* impairment, as well as the permanent or long term impact of *the* impairment." *Fraser*, 342 F.3d at 1038 (citations omitted) (emphasis added).

In this case, there has not been even so much as a suggestion that Plaintiff's alleged limitations on his ability to engage in the major life activity of eating are due to anything other than his diabetic condition. While the purpose of Scheerer's limitations was not to control his blood sugar levels, that is exactly the purpose of Plaintiff's limitations. Accordingly, *Scheerer* does not lead the Court to conclude that Plaintiff is not disabled within the meaning of the ADA.

### (b).    Applying *Branham*

In *Branham*, the Seventh Circuit concluded that the diabetic plaintiff had presented at least enough evidence that his diabetes substantially limited his ability to engage in the major life

activity of eating so as to survive summary judgment.  392 F.3d at 904.  Like Branham, Plaintiff

has never experienced a severe reaction to his diabetic treatment but is still restricted as to the

manner in which he can eat as compared to the average person in the general population; must

monitor his blood-sugar levels several times a day; must monitor his food intake carefully

including what and when he eats; and, even after the mitigating measures of his treatment

regimen, he is never free to eat whatever he pleases because he risks significant bodily reactions

if he disregards his blood sugar readings.  *Compare id*. at 903–04, *with Davenport Affidavit*, ¶¶

2–4, 8–9 (Docket No. 19, Att. 3).  In this action, as in *Branham*, a trier of fact rationally could

determine that Plaintiff's diabetes and the treatment regimen he must follow substantially limits

him in the major life activity of eating.  Accordingly, Plaintiff is disabled within the meaning of

the ADA.[5]

## ii.    Record of an Impairment & Regarded as Disabled

Plaintiff argues that, in addition to meeting the first category of the disability definition,

he meets the other two in that he has a record of having a disabling impairment (category 2) and

can establish that the DEQ regarded him as disabled (category 3).  *Plaintiff's Memorandum in

Opposition to Motion for Summary Judgment*, p. 9 (Docket No. 19).  Because there is at least a

genuine issue of material fact as to whether Plaintiff's diabetes substantially limits his ability to

engage in the major life activity of eating, i.e., whether Plaintiff meets the first category of the

---

[5] Defendant also points to a case from the Eighth Circuit Court of Appeals, *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720 (8th Cir. 2002).  *Defendant's Supplemental Brief on Motion for Summary Judgment*, p. 2 (Docket No. 32). Therein, the Eighth Circuit expressly declined to consider whether the plaintiff's diabetic condition substantially limited plaintiff in the major life activity of eating because the plaintiff had not raised such an argument in his complaint or in the district court.  *Id.* at 725.  Accordingly, though Plaintiff's and Orr's limitations may be similar, *Orr* provides no assistance in determining whether Plaintiff's diabetic condition substantially limits his ability to engage in the major life activity of eating.

**MEMORANDUM DECISION & ORDER -21-**

disability definition, the Court need not address, at this time, whether Plaintiff meets either of the other categories.

### b.      Qualified, With or Without an Accommodation, for the Positions

In addition to showing that he has a disability within the meaning of the ADA, the Plaintiff, to establish a *prima facie* case, must show that he was a qualified individual, with or without an accommodation, for the A-3 or A-2 positions.  *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

While Defendant has placed great emphasis on its contention that Plaintiff did not have the necessary skills to perform adequately in the A-3 or A-2 positions, it has done so solely with regard to its contention that it had a legitimate, non-discriminatory reason for the adverse employment actions, not with regard to whether Plaintiff was not "qualified for the position" within the meaning of the second element of the *prima facie* case for disability discrimination under the ADA.

At a minimum, it is undisputed that, when Defendant hired Plaintiff for the A-3 position, it considered Plaintiff at least minimally qualified for the position.  Accordingly, Plaintiff has provided sufficient evidence on which a rational trier of fact could conclude that Plaintiff was a qualified individual within the meaning of the ADA.

### c.      Adverse Employment Action Because of Disability

To establish the third and final element of the *prima facie* case, Plaintiff must show that he was discriminated against by Defendant, i.e., subjected to an adverse employment action, because of his disability.  *Broussard*, 192 F.3d at 1256.  In this context, "discriminating" refers to "limiting, segregating, or classifying a[n] . . . employee in a way that adversely affects the

opportunities or status of such . . . employee because of the disability of such . . . employee."  42 U.S.C. § 12112(b)(1).

In this regard, Plaintiff argues that he "suffered three distinct adverse employment actions as a result of disability discrimination," namely the following: (1) the imposition of the work restrictions, (2) being demoted from his A-3 position, and (3) being terminated from employment from his A-2 position.  *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, pp. 10–12 (Docket No. 19).

i.      <u>**Work Restrictions**</u>

As to the alleged adverse employment action, i.e., the imposition of the work restrictions, while it is undisputed that the restrictions were put in place because of Plaintiff's diabetes, *see Johnston Deposition*, *Exhibit 3 to Tingey Affidavit*, p. 3 (Docket No. 14, Att. 3), it is less clear whether the work restrictions constitute an adverse employment action.  Defendant argued at the September 26, 2006, hearing before the Court, that the imposition of the work restrictions does not constitute an *adverse* employment action because the restrictions were put in place as an accommodation to Plaintiff.  Apparently, Defendant contends that, for an employment action to constitute an *adverse* employment action, the actor must intend such action to be adverse to the employee.

The Ninth Circuit Court of Appeals has explained that, at least in the context of an ADA retaliation claim, an "adverse employment action" is any action that is reasonably likely to deter employees from engaging in protected activity.  *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) (quoting *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000)).  Unfortunately, no such clear definition has yet been provided by the Ninth Circuit in the context of a disability discrimination claim under the ADA outside of the retaliation arena.  However, at

**MEMORANDUM DECISION & ORDER -23-**

least in the context of ADA retaliation claims, the Ninth Circuit Court of Appeals takes an expansive view of what constitutes an adverse employment action. *Ray*, 217 F.3d at 1241. The Court sees no reason why such an expansive view should not also apply in the context of ADA discrimination claims.

As noted above, an employment action based on an employee's disability is discriminating if it limits, segregates, or classifies an employee in such a way that adversely affects the employee's opportunities. 42 U.S.C. § 12112(b)(1). In this case, a rational trier of fact could reasonably conclude that the work restrictions limited Plaintiff's ability to perform the normal functions of the A-3 position in such a way that adversely affected Plaintiff's opportunities in that position. For example, by not being able to freely work in the field, Plaintiff did not have as many opportunities as he otherwise would have to expand his understanding of the job or to demonstrate his abilities to adequately perform *all* of the functions of the job. Accordingly, a rational trier of fact could reasonably conclude that the work restrictions (1) were imposed because of Plaintiff's diabetes and (2) adversely affected Plaintiff's opportunities. Thus, Plaintiff has established sufficient evidence with regard to the third element of the *prima facie* case as far as his claim that the work restrictions constituted adverse employment actions because of his diabetes.

ii.   **Demotion from A-3 Position & Termination from A-2 Position**[6]

Clearly, a demotion is an adverse employment action, as is a termination. Less clear, however, is whether Plaintiff's demotion and termination were *because of* his diabetes rather than because of his alleged inability to adequately perform the duties of the position.

As discussed earlier, Plaintiff bears the initial burden of presenting evidence that gives rise to an inference of unlawful disability discrimination. *Bradley*, 104 F.3d at 270.

In arguing that his demotion from the A-3 position and termination from the A-2 position were because of his diabetes, Plaintiff began by rebutting Defendant's allegations of legitimate, nondiscriminatory reasons for the demotion, i.e., that Plaintiff had failed in several job tasks. *See Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, p. 12 (Docket No. 19). In so doing, Plaintiff jumps ahead in the burden-shifting process, which requires Plaintiff to first establish that the adverse employment actions were because of his disability and requires evidence of pretext only if Defendant produces legitimate, nondiscriminatory reasons for the action. Nonetheless, because the same evidence used to establish a *prima facie* case must be considered when determining whether legitimate, nondiscriminatory reasons for employment actions have been rebutted, *Wallis*, 26 F.3d at 890, the Court will consider Plaintiff's evidence of pretext as evidence that Plaintiff would use to make a *prima facie* showing.

Plaintiff's evidence to show pretextual motive consists of the following: (1) Plaintiff's contention that his work was not criticized before the DEQ adopted the work restrictions; (2) Plaintiff's contention that "[o]nly after DEQ learned about Mr. Davenport's diabetes did his

---

[6] In addressing the third element of the *prima facie* case for the demotion and termination, Plaintiff relies on essentially the same evidence in regard to both actions. *See Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, pp. 14–16 (Docket No. 19). Accordingly, the Court will consider Plaintiff's showing for each simultaneously.

technical skill suddenly become a problem"; (3) Plaintiff's dispute of DEQ's criticisms of his

work; (4) Plaintiff's denial that "he did not understand the content of typical reports, basic

notations in laboratory data sheets, latitude and longitude, and/or compass bearings"; (5) the fact

that Plaintiff was required to take and pass an exam, though no other A-2 in the State of Idaho

had ever been required to pass such an exam; and (6) DEQ's failure to provide any narrative

explanation for Plaintiff's failure of the probationary period, which, Plaintiff claims, "suggests

another motive." *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, pp.

14–17 (Docket No. 19); *Johnston Deposition, Exhibit 3 to Casperson Affidavit*, p. 27 (Docket

No. 19, Att. 2).

      The facts upon which Plaintiff relies are either unsupported by evidence in the record or

constitute mere speculation, allegation, the denial of the credibility of Defendant's evidence, or

subjective personal judgments of Plaintiff's competence for the position. "[M]ere allegation and

speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima

Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266

(9th Cir. 1995)). Further, to defeat summary judgment, Plaintiff must do more than deny the

credibility of Defendant's evidence, *Wallis*, 26 F.3d at 890, and "an employee's subjective

personal judgments of [his] competence alone do not raise a genuine issue of material fact,"

*Bradley*, 104 F.3d at 270. Accordingly, Plaintiff has not presented sufficient evidence to give

rise to an inference that either his demotion from the A-3 position or his termination from the A-

2 position were because of his diabetes.

      **d.**   ***Prima Facie* Case Conclusion**

      Plaintiff has presented sufficient evidence to establish a *prima facie* case (1) that he was

disabled as contemplated by the ADA in that his diabetes substantially limited his ability to

**MEMORANDUM DECISION & ORDER -26-**

engage in the major life activity of eating, (2) that he was qualified, with or without reasonable accommodation, for the A-3 and A-2 positions, and (3) that the imposition of work restrictions constituted adverse employment actions because of his disability.  However, because Plaintiff has not otherwise established his *prima facie* case, Defendant's Motion for Summary Judgment is granted to the extent that Plaintiff's disability discrimination claims are based on allegations that his demotion from the A-3 position and termination from the A-2 position constituted adverse employment actions because of his disability.

### 2.   Legitimate, Nondiscriminatory Reasons for the Adverse Employment Action

Because a rational trier of fact could reasonably conclude that Plaintiff has met his burden of establishing his *prima facie* case for a claim that the imposition of the work restrictions constituted disability discrimination, the burden has shifted to Defendant to produce legitimate, nondiscriminatory reasons for the imposition of the restrictions.

While Defendant has presented legitimate, non-discriminatory reasons for the demotion from the A-3 position and the termination from the A-2 position,[7] Defendant has not asserted that it had a legitimate, nondiscriminatory reason for the imposition of the work restrictions. Accordingly, Defendant has not rebutted Plaintiff's *prima facie* showing.  Thus, Defendant's Motion for Summary Judgment, as to Plaintiff's claim that the imposition of work restrictions constituted disability discrimination is denied.

---

[7] Specifically, Defendant contends that these adverse employment actions were because there were several problems with Plaintiff's work, including difficulty in understanding the content of typical reports, basic notations in laboratory data sheets, latitude and longitude readings, and compass bearings, placing a monitor well in the wrong location due to inability to recognize a clay layer or understand its significance, and failing to properly prepare ground water samples for analysis. *Heaton Deposition, Exhibit 2 to Tingey Affidavit*, pp. 4, 6–8, 11–12 (Docket No. 14, Att. 2); *June 20, 2003, Notes, Exhibit 28 to Heaton Deposition, Exhibit 6 to Tingey Affidavit*, p. 2 (Docket No. 14, Att. 6); *see also Johnston Deposition, Exhibit 3 to Tingey Affidavit*, pp. 2, 4 (Docket No. 14, Att. 3) (noting Heaton's reported concerns about Plaintiff's abilities to adequately perform the job); *Johnston Deposition, Exhibit 3 to Tingey Affidavit*, p. 5 (noting Johnston's disbelief that Plaintiff had the "basic technical abilities to do the basic requirements of the job") (Docket No. 14, Att. 3).

**MEMORANDUM DECISION & ORDER -27-**

### 3. <u>Disability Discrimination Conclusion</u>

In accordance with the foregoing, Defendant's Motion for Summary Judgment is granted to the extent that Plaintiff's claims of disability discrimination pursuant to Counts One, Two, and Three are based on the assertion that the demotion from the A-3 position and termination from the A-2 position were based on Plaintiff's diabetes.  Hence, Plaintiff's disability discrimination claims survive only to the extent they are based on the imposition of the work restrictions.

### D. <u>Failure to Accommodate</u>

In Counts Four and Five, Plaintiff claims Defendant violated the Rehabilitation Act and the Idaho HRA, respectively, by failing to reasonably accommodate his disability.  *Amended Complaint & Demand for Jury Trial*, pp. 11–12 (Docket No. 3).

An employer must make "reasonable accommodation *to the known physical . . . limitations* of an otherwise qualified . . . employee with a disability, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  29 C.F.R. § 1630.9(a) (emphasis added).  Plaintiff claims that, after Defendant imposed work restrictions upon him, Defendant "provided no accommodations for Mr. Davenport to be able to perform the essential functions of his position."  *Plaintiff's Memorandum in Opposition to Motion for Summary Judgment*, p. 18 (Docket No. 19).

Notably, Plaintiff emphasizes that "Mr. Davenport never believed he needed any accommodation for his diabetes other than his food and insulin," but "[o]nly after DEQ imposed the [work] restrictions did Mr. Davenport need accommodation!"  *Id*. at p. 19.  Thus, while Plaintiff contends that Defendant should have provided reasonable accommodation to the work restrictions, he has not contended that Defendant should have provided reasonable

accommodation to his physical limitation, i.e., his diabetes.  By so arguing, Plaintiff makes it clear that his diabetes did not necessitate any accommodation.

The acts pursuant to which Plaintiff brings his failure-to-accommodate claims require an employer to accommodate *disabilities*.  *See* 29 C.F.R. § 1630.9(a) (requiring employers to make reasonable accommodation "to the known physical . . . limitations" of an employee).  Because Plaintiff admits that he did not need any accommodation to his physical limitation, Defendant's Motion for Summary Judgment is granted to the extent Plaintiff asserts claims for failure to accommodate.

**E.** **Summary**

In accordance with the foregoing, Defendant's Motion for Summary Judgment is granted with regard to the following Counts:

1. Counts One, Two, and Three (the disability discrimination claims), to the extent that the disability discrimination claims are based on Plaintiff's demotion from the A-3 position or termination from the A-2 position.

2. Count Three (the ADA claim), to the further extent that it seeks recovery under Title II of the ADA or seeks recovery of money damages under Title I of the ADA.

3. Counts Four and Five (the failure-to-accommodate claims).

Correspondingly, Defendant's Motion for Summary Judgment is denied with regard to the following Counts:

1. Counts One, Two, and Three (the disability discrimination claims), to the limited extent that the disability discrimination claims are based on the imposition of the work restrictions.

**MEMORANDUM DECISION & ORDER -29-**

2.      Count Three (the ADA claim) to the further limited extent that it seeks non-monetary recovery under Title I of the ADA.

## III.

## MOTION FOR ACCESS TO MEDICAL RECORDS

On August 3, 2006, Defendant filed its Motion for Entry of Order for Access to Medical Records and Information and Entry of Qualified Protective Order (Docket No. 22), seeking an opportunity to review and discuss Plaintiff's medical records with Dr. Tony Golden, M.D., the health care provider who was contracted by Defendant to provide the initial medical examination of Plaintiff when he began the A-3 position. Plaintiff opposes the motion, arguing that "Defendant never requested any medical records from Mr. Davenport or a release in order for it to obtain medical records or speak to Dr. Golden." *Plaintiff's Memorandum in Opposition to Motion for Access to Medical Records*, pp. 1–2 (Docket No. 25).

Because Defendant's motion is effectively a request for disclosure of potentially relevant information, the motion is appropriately a motion regarding discovery. As such, and because all discovery in this action was ordered to be completed by June 23, 2006, *Case Management Order*, ¶ 5 (Docket No. 12), Defendant's request, in effect, seeks an extension of the already-expired discovery period, though for a limited purpose of acquiring access to records. Accordingly, the Court will construe the motion as a motion to modify the pretrial scheduling order.

Federal courts are given broad discretion in supervising the pretrial phase of litigation. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). Pursuant to Federal Rule of Civil Procedure 16, a pretrial scheduling order "shall not be modified except upon a showing of good cause." Fed. R. Civ. P. 16(b). Accordingly, a pretrial schedule may be modified "if it

**MEMORANDUM DECISION & ORDER -30-**

cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).  Further, though "the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.*

Although a strong showing has not been made to modify the scheduling order, the relief sought by Defendant is not excessive, burdensome nor unreasonable.  Accordingly, the scheduling order shall be modified for the limited purpose of requiring Plaintiff to provide Defendant with a properly executed written authorization form to allow it to obtain a complete set of  Davenport's medical records contained in the files of Tony Golden, MD.  Further, Defendant will be allowed to conduct a one-hour deposition of the physician provided it is completed prior to December 1, 2006.

To the extent that Defendant's motion seek s a private meeting with Dr. Golden to discuss Davenport's records, the motion is denied.

Defendant shall be responsible for any charges that may be incurred in either obtaining copies of the medical records or the deposition of Dr. Golden, should it be taken.

## IV.

## MOTION TO STRIKE AFFIDAVIT

On August 8, 2006, Defendant filed its Motion to Strike Affidavit (Docket No. 23), seeking an order striking portions of the Affidavit of Chris Davenport (Docket No. 19, Att. 3).  Specifically, "Defendant moves to strike paragraphs 17 and 45 on the grounds that said paragraphs contain inadmissible hearsay, and paragraphs 21 on the grounds that said paragraph

is argumentative and attempts to assert a legal conclusion." *Defendant's Motion to Strike*, p. 1

(Docket No. 23).

In paragraph 17 of his affidavit, Davenport states:

> I reported to Dr. Tony Golden, M.D., at his offices for my medical monitoring evaluation. I informed Dr. Golden that I had diabetes and he appeared shocked. I asked him if that was a problem and he told me that the State of Idaho will not allow people with diabetes to drive in some jobs. Dr. Golden never asked me any questions about my diabetes or treatment for it other than whether it was under control. I reported that it was under control.

*Davenport Affidavit*, ¶ 17 (Docket No. 19, Att. 3). In paragraph 45, he states:

> After the examination, Mr. Teuscher and Mr. Heaton stopped meeting with me. I was told shortly after to start looking for a new job. At this time, I had only been in the A-2 position for approximately two months. I am not aware of any other A-2 who has been required to take an examination. I asked an A-2 employee who performs the same work out of the Pocatello office a couple of the questions, and even she did not know the answers.

*Id*. at ¶ 45. Finally, in paragraph 21, Plaintiff states:

> DEQ did not provide any type of accommodation as a result of the restrictions. Mr. Heaton simply told me that I could not do any field work without someone with me.

*Id*. at ¶ 21.

Defendant brings its motion to strike pursuant to Federal Rule of Civil Procedure 12(f).

*Defendant's Motion to Strike Affidavit*, p. 1 (Docket No. 23). Rule 12(f) provides in part that

> [u]pon motion made by a party before responding to a pleading . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

A motion to strike is "neither an authorized nor a proper way to procure the dismissal of

all or part of a complaint, or a counterclaim, or *to strike affidavits*." *Rockholt v. United Van*

*Lines*, 697 F. Supp. 383, 386 (D. Idaho 1988) (quoting 5 Charles Alan Wright & Arthur R.

**MEMORANDUM DECISION & ORDER -32-**

MILLER, FEDERAL PRACTICE AND PROCEDURE § 1380 (1969)) (emphasis added).  Further, as a general rule, motions to strike based on Rule 12(f) are viewed with disfavor and are not frequently granted.  *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990); *United States v. Shell Oil Co.*, 605 F. Supp. 1064, 1085 (D. Colo. 1985).  Accordingly, and because the Court did not rest its decision with regard to the Motion for Summary Judgment (Docket No. 13) on the contents of the challenged paragraphs, Defendant's Motion to Strike is denied.

## V.

## ORDER

In accordance with the foregoing, IT IS HEREBY ORDERED:

1.    Defendant's Motion for Summary Judgment (Docket No. 13) is GRANTED in part and DENIED in part as set forth below:

    a.    Defendant's Motion for Summary Judgment is granted with regard to the following Counts:

        i.    Counts One, Two, and Three (the disability discrimination claims), to the extent that the claims are based on Plaintiff's demotion from the A-3 position or termination from the A-2 position.

        ii.    Count Three (the ADA claim), to the further extent that it seeks recovery under Title II of the ADA or money damages under Title I of the ADA.

        iii.    Counts Four and Five (the failure-to-accommodate claims).

      b.      Defendant's Motion for Summary Judgment is denied with regard to the following Counts:

          i.      Counts One, Two, and Three (the disability discrimination claims), to the limited extent the claims are based on the imposition of the work restrictions.

          ii.      Count Three (the ADA claim) to the further limited extent that Plaintiff seeks only non-monetary recovery under Title I of the ADA.

2.      Defendant's Motion for Entry of Order for Access to Medical Records and Information and Entry of Qualified Protective Order (Docket No. 22) is GRANTED.

3.      Defendant's Motion to Strike Affidavit (Docket No. 23) is DENIED.

DATED:  **October 25, 2006**.

Honorable Larry M. Boyle
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION & ORDER -34-**